**STATE of Missouri ex rel. OFFICE OF the PUBLIC COUNSEL and MISSOURI INDUSTRIAL ENERGY CONSUMERS, Appellants,**

v.

**MISSOURI PUBLIC SERVICE COMMISSION and Union Electric Company d/b/a AmerenUE, Respondents.**

**Nos. WD 72498, WD 72508.**

Missouri Court of Appeals,
Western District.

Feb. 1, 2011.

tion to dismiss appeal, both of which this Court denied.

Lewis R. Mills, Jr., Jefferson City, MO, Attorney for Appellant, Office of the Public Counsel.

Diana M. Vuylsteke and John R. Kindschuh, St. Louis, MO, Edward F. Downey, Jefferson City, MO, Attorneys for Appellant, Missouri Industrial Energy Consumers.

Jennifer Heintz, Jefferson City, MO, Attorney for Respondent, Missouri Public Service Commission.

James B. Lowery and Amanda Allen Miller, Columbia, MO, Thomas M. Byrne, St. Louis, MO, Attorneys for Respondent, Union Electric Company d/b/a AmerenUE.

Before Division I: MARK D. PFEIFFER, Presiding Judge, and THOMAS H. NEWTON and ALOK AHUJA, Judges.

MARK D. PFEIFFER, Presiding Judge.

Appellants, Office of Public Counsel[1] ("OPC") and Missouri Industrial Energy Consumers[2] ("MIEC") appeal from the judgment of the Circuit Court of Cole County affirming the Public Service Commission ("PSC") Order promulgating 4 CSR 240–3.162 and 4 CSR 240–20.091 (the "Regulations") as lawful and reasonable. OPC and MIEC raise four points of error on appeal. They argue: (1) the PSC failed to timely adopt the Regulations pursuant to section 386.266.9;[3] (2) the Regulations allow electric utilities to earn more than a fair rate of return on equity for each periodic rate adjustment, thereby violating section 386.266.4(1); (3) the Regulations are contrary to the true-up mechanism required in section 386.266.4(2); and (4)

---

1. The Office of Public Counsel is an agency of the State of Missouri, and pursuant to statutory authority, represents the public in all proceedings before the PSC and in any related appeals. *See* sections 386.700 and 386.710, RSMo.

2. MIEC is a not-for-profit mutual benefit corporation representing the interests of certain corporations who purchase large amounts of electricity in Missouri. The members of MIEC include the following: Anheuser-Busch, BioKyowa, Boeing, Cargill, Chrysler, Doe Run, Enbridge, Ford, General Motors, Hussmann, JW Aluminum, Monsanto, National Starch, Nestle Purina, Pfizer, Precoat, Proctor & Gamble, Solutia, Noranda Aluminum, and U.S. Silica.

3. The citation for section 386.266 is RSMo Cum.Supp.2010. All other statutory citations are to RSMo 2000 unless otherwise noted.

the cap on annual adjustments in the Regulations conflicts with section 386.266.2. We disagree and affirm.

### Factual and Procedural Background

The PSC is the state agency responsible for regulation of public utilities operating in the State of Missouri. § 386.040. The PSC has jurisdiction over the manufacture, sale, and distribution of electricity. § 386.250(1); *see also* § 393.140. The PSC is authorized to approve rate schedules for electrical corporations, typically during a general rate case, as long as the rate is just and reasonable both to the utility and to its customers. § 393.150. Only after providing reasonable notice to interested persons, a full hearing on the matter, and consideration of all relevant factors, including operating expenses, depreciation of plant, taxes, and the utilities' approved rate of return on equity, may the PSC approve the new rate. *Id.*

During the 2005 legislative session, the Missouri legislature passed Senate Bill 179, later codified at section 386.266. Section 386.266 authorizes the PSC to establish an environmental cost recovery mechanism ("ECRM")[4] to reflect increases and decreases in a utility's prudently incurred costs to comply with any federal, state, or local environmental law, regulation, or rule. Pursuant to section 386.266, the PSC drafted two proposed rules, 4 CSR 240–20.091 and 4 CSR 240–3.162. 4 CSR 240–20.091 provides for the establishment of an ECRM in an electric utility's rate schedule which allows periodic rate adjustments to reflect net increases or decreases in a utility's prudently incurred costs directly related to compliance with any federal, state, or local environmental law, regulation, or rule.[5] 4 CSR 240–3.162 implements section 386.266 by providing electric utility ECRM filing and submission requirements.

On December 17, 2008, the PSC initiated the rulemaking proceeding to consider the adoption of the rules. The notice of proposed rulemaking was transmitted to the Secretary of State on January 2, 2009, and published in the *Missouri Register* on February 3, 2009. After the public comment time period ended on March 4, 2009, a public hearing was held on that same day. A second comment period ended on April 15, 2009, followed by another hearing. Among the participants who commented at the hearings were the OPC, MIEC, Union Electric Company ("AmerenUE"), and the PSC Staff ("Staff"). While OPC and MIEC opposed the proposed rules, AmerenUE and Staff supported them. Proposals to change the language and operation of the rules were made by both supporters and opponents of the rules; however, no significant changes were made.

The PSC transmitted orders of rulemaking to the Secretary of State on April 23, 2009. On May 22, 2009, OPC filed its

---

4. An ECRM is "a mechanism established in a general rate proceeding that allows periodic rate adjustments, outside a general rate proceeding, to reflect the net increases or decreases in an electric utility's incurred environmental costs." 4 CSR 240–20.091(1)(B). *See also* 4 CSR 240–3.162(1)(D).

5. In the PSC's Order of Rulemaking, it described the public interest for the subject ECRM rules: "Other filings made by Missouri electric utilities to this commission indicate that those utilities are in the process of spending hundreds of millions, possibly billions of dollars to comply with new and proposed federal regulations. These regulations are a tool that can be used by the commission to help the company install new environmental upgrades while maintaining access to the capital markets to fund other necessary or desirable infrastructure investments and to do so in a manner that could ultimately lower costs to the ratepayer."

Application for Rehearing of the two orders of rulemaking for the proposed rules. The PSC transmitted the final orders of rulemaking to the Secretary of State on May 26, 2009, and denied OPC's application for rehearing on June 10, 2009. The rules were published in the *Missouri Register* on July 1, 2009, as 4 CSR 240–20.091 and 4 CSR 240–3.162 and became effective on August 30, 2009.

OPC filed a timely petition for writ of review in the Circuit Court of Cole County ("circuit court"). MIEC and AmerenUE both filed motions to intervene which were sustained by the circuit court. On March 31, 2010, the circuit court affirmed the final orders of rulemaking, holding that the Regulations were lawful and reasonable. OPC and MIEC filed separate notices of appeal, which were consolidated by this court.[6]

### Standard of Review

When a party appeals from an order of the PSC, we review the PSC's findings and decision and not the circuit court's judgment. *State ex rel. Mo. Gas Energy v. Pub. Serv. Comm'n,* 186 S.W.3d 376, 381 (Mo.App. W.D.2005). Our review of the PSC's order is two-fold: first, we must determine "whether the [PSC's] order is lawful, and second, whether the order is reasonable[.]" *Id.* Additionally, the party seeking to set aside the PSC's order has the burden to prove by clear and satisfactory evidence that the order was unlawful or unreasonable. *E.g.,* § 386.430; *State ex rel. Util. Consumers' Council of Mo., Inc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 47 (Mo. banc 1979); *State ex rel. BPS Tel. Co. v. Mo. Pub. Serv. Comm'n,* 285 S.W.3d 395, 401–02 (Mo.App. W.D.2009).

Lawfulness is determined by whether or not the PSC had the statutory authority to act as it did. *Mo. Gas Energy,* 186 S.W.3d at 382. When determining whether the order is lawful, we exercise independent judgment and must correct erroneous interpretations of the law. *Burlington N. R.R. v. Dir. of Revenue,* 785 S.W.2d 272, 273 (Mo. banc 1990). Because the PSC "is purely a creature of statute, [its] powers are limited to those conferred by [statute] either expressly, or by clear implication as necessary to carry out the powers specifically granted." *Util. Consumers' Council of Mo.,* 585 S.W.2d at 49. While section 386.266 should be liberally construed in order to effectuate its purpose, " 'neither convenience, expediency or necessity are proper matters for consideration in the determination of' whether or not an act of the [PSC] is authorized by the statute." *Id.* (quoting *State ex rel. Kansas City v. Pub. Serv. Comm'n,* 301 Mo. 179, 257 S.W. 462 (Mo. banc 1923)).

However, "[o]nce it is determined that an act is within the [PSC's] authority ... these considerations and others become part of the broad discretion accorded the [PSC] to set just and reasonable rates." *Id.* The reasonableness of the order setting new rates is dependent upon whether or not "(i) the order is supported

6. The PSC subsequently filed a motion to dismiss the appeal by MIEC because MIEC filed neither an application for rehearing with the PSC nor a petition for writ of review in the circuit court. However, whether MIEC is a proper party in this action is immaterial. MIEC raises on appeal the same issues raised by OPC, in a jointly filed brief. Those issues are, thus, properly before the court for decision whether or not MIEC is entitled to appeal. In addition, we find the Regulations to be lawful and reasonable; therefore, the Regulations will be binding on MIEC irrespective of its status in this proceeding. Accordingly, we deny the motion to dismiss as moot.

by substantial and competent evidence[7] on the whole record, (ii) the decision is arbitrary, capricious or unreasonable, or (iii) the [PSC] abused its discretion." *Mo. Gas Energy*, 186 S.W.3d at 382. Furthermore, if the PSC's decision is based on purely factual issues, we may not substitute our judgment for that of the PSC. *State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 938 S.W.2d 339, 342 (Mo.App. W.D.1997).[8]

## Analysis

While OPC and MIEC present four separate points on appeal, a common issue appears in each—the statutory construction of section 386.266 and its necessary impact on the Regulations. The parties agree that "[i]f the legislature wishes to approve automatic adjustment clauses, it can of course do so by amendment of the statutes, and set up appropriate statutory checks, safeguards, and mechanisms for public participation." *Util. Consumers Council of Mo.*, 585 S.W.2d at 57. Thus, there is no dispute that the legislature had the authority to enact section 386.266. The dispute centers upon the intent of the legislature's statutory checks and balances in section 386.266 and the argument by OPC and MIEC that the Regulations fail to comply with the "appropriate statutory checks" and "safeguards" for consumers.

Statutory construction is a matter of law. *City of St. Joseph v. Vill. of Country Club*, 163 S.W.3d 905, 907 (Mo. banc 2005). When employing principles of statutory construction, the primary rule is to ascertain the intent of the legislature from the language used, by considering the plain and ordinary meaning of the words used in the statute. *S. Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. banc 2009); *State v. McLaughlin*, 265 S.W.3d 257, 267 (Mo. banc 2008) (stating that in the absence of guiding case or other authority, the language of the statute itself provides the best guide to determine the legislature's intent). "Where the language of a statute is unambiguous and clear, this Court will give effect to the language as written, and will not engage in statutory construction." *Dubinsky v. St. Louis Blues Hockey Club*, 229 S.W.3d 126, 130 (Mo.App. E.D.2007) (citing *Maxwell v. Daviess County*, 190 S.W.3d 606, 610–11 (Mo.App. W.D.2006)). A court will look beyond the plain meaning of the statute only when the language is ambiguous or will lead to an absurd or illogical result. *Spradlin v. City of Fulton*, 982 S.W.2d 255, 258 (Mo. banc 1998).

When "determining the intent and meaning of statutory language, 'the words must be considered in context and sections of the statutes in pari materia, as well as cognate sections, must be considered in order to arrive at the true meaning and scope of the words.'" *State ex rel. Evans v. Brown Builders Elec. Co.*, 254 S.W.3d 31, 35 (Mo. banc 2008) (quoting *State ex rel. Wright v. Carter*, 319 S.W.2d 596, 600 (Mo. banc 1959)). Furthermore, the pur-

---

7. "Substantial evidence is competent evidence which, if true, has a probative force on the issues." *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n*, 976 S.W.2d 470, 476 (Mo.App. W.D.1998) (internal quotation marks omitted).

8. Although the appellants couch their points relied on in terms of both the "unlawfulness" and "unreasonableness" of the Regulations, their argument is focused on the complaint that the Regulations "unlawfully" fail to comply with the regulatory enabling statute, section 386.266, and the only challenge to the "reasonableness" of the Regulations is their claim that the PSC's application of the dictates of section 386.266 to the Regulations is "unreasonable," which is really a matter of statutory interpretation—or, stated another way, a question of "lawfulness" not "reasonableness."

pose of the whole act must be considered. *Neske v. City of St. Louis,* 218 S.W.3d 417, 424 (Mo. banc 2007). We presume that the legislature intended that each word, clause, sentence, and provision of a statute have effect and should be given meaning. *Id.*; *State ex rel. Womack v. Rolf,* 173 S.W.3d 634, 638 (Mo. banc 2005). Conversely, we presume "that the legislature did not insert idle verbiage or superfluous language in a statute." *Abbott Ambulance v. St. Charles Cnty. Ambulance Dist.,* 193 S.W.3d 354, 358 (Mo.App. E.D.2006). Courts are not authorized to read a legislative intent into a statute that is contrary to the intent made evident by the plain and ordinary meaning of the statutory language. *Id.* Finally, "'[t]he interpretation and construction of a statute by an agency charged with its administration is entitled to great weight.'" *State ex rel. Barnett v. Mo. State Lottery Comm'n,* 196 S.W.3d 72, 75 (Mo.App. W.D.2006) (quoting *Foremost–McKesson, Inc. v. Davis,* 488 S.W.2d 193, 197 (Mo. banc 1972)). "Nonetheless, this Court exercises independent judgment and must correct erroneous interpretations of law." *State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n,* 165 S.W.3d 160, 164 (Mo. banc 2005).

Section 386.266 provides, in pertinent part:

2. Subject to the requirements of this section, any electrical, gas, or water corporation may make an application to the commission to approve rate schedules authorizing periodic rate adjustments outside of general rate proceedings to reflect increases and decreases in its prudently incurred costs, whether capital or expense, to comply with any federal, state, or local environmental law, regulation, or rule. Any rate adjustment made under such rate schedules shall not exceed an annual amount equal to two and one-half percent of the electrical, gas, or water corporation's Missouri gross jurisdictional revenues, excluding gross receipts tax, sales tax and other similar pass-through taxes not included in tariffed rates, for regulated services as established in the utility's most recent general rate case or complaint proceeding. In addition to the rate adjustment, the electrical, gas, or water corporation shall be permitted to collect any applicable gross receipts tax, sales tax, or other similar pass-through taxes, and such taxes shall not be counted against the two and one-half percent rate adjustment cap. Any costs not recovered as a result of the annual two and one-half percent limitation on rate adjustments may be deferred, at a carrying cost each month equal to the utilities net of tax cost of capital, for recovery in a subsequent year or in the corporation's next general rate case or complaint proceeding.

. . . .

4. The commission shall have the power to approve, modify, or reject adjustment mechanisms submitted under subsections 1 to 3 of this section only after providing the opportunity for a full hearing in a general rate proceeding, including a general rate proceeding initiated by complaint. The commission may approve such rate schedules after considering all relevant factors which may affect the costs or overall rates and charges of the corporation, provided that it finds that the adjustment mechanism set forth in the schedules:

(1) Is reasonably designed to provide the utility with a sufficient opportunity to earn a fair return on equity;

(2) Includes provisions for an annual true-up which shall accurately and appropriately remedy any over- or under-collections, including inter-

est at the utility's short-term borrowing rate, through subsequent rate adjustments or refunds;

(3) In the case of an adjustment mechanism submitted under subsections 1 and 2 of this section, includes provisions requiring that the utility file a general rate case with the effective date of new rates to be no later than four years after the effective date of the commission order implementing the adjustment mechanism. However, with respect to each mechanism, the four-year period shall not include any periods in which the utility is prohibited from collecting any charges under the adjustment mechanism, or any period for which charges collected under the adjustment mechanism must be fully refunded. In the event a court determines that the adjustment mechanism is unlawful and all moneys collected thereunder are fully refunded, the utility shall be relieved of any obligation under that adjustment mechanism to file a rate case;

(4) In the case of an adjustment mechanism submitted under subsection 1 or 2 of this section, includes provisions for prudence reviews of the costs subject to the adjustment mechanism no less frequently than at eighteen-month intervals, and shall require refund of any imprudently incurred costs plus interest at the utility's short-term borrowing rate.

. . . .

9. Prior to August 28, 2005,[9] the commission shall have the authority to promulgate rules under the provisions of chapter 536 as it deems necessary, to govern the structure, content and operation of such rate adjustments, and the procedure for the submission, frequency, examination, hearing and approval of such rate adjustments. Such rules shall be promulgated no later than one hundred fifty days after the initiation of such rulemaking proceeding. Any electrical, gas, or water corporation may apply for any adjustment mechanism under this section whether or not the commission has promulgated any such rules.

. . . .

12. The provisions of this section shall take effect on January 1, 2006, and the commission shall have previously promulgated rules to implement the application process for any rate adjustment mechanism under this section prior to the commission issuing an order for any rate adjustment.

The plain language of section 386.266 clearly permits periodic rate adjustments outside of a general rate case in order to reflect increases and decreases in prudently incurred environmental compliance costs and expenses. The legislature plainly intended to allow more flexibility for rate adjustments due to the recent surge in environmental regulation and subsequent rise in compliance costs.

Generally, traditional ratemaking methods can be expensive and time consuming, for both the utility and consumer. Because an ECRM reduces the expense of the regulatory process by decreasing both the magnitude and frequency of rate cases, it is more efficient and effective when deal-

9. The final approved version of S.B. 179, section 386.266.9 actually reads: "Prior to the effective date of this section," not "Prior to August 28, 2005" as the final published statute reads. *See* S.B. 179, 2005 Mo. Laws 1069, 1071. We note that the actual effective date of section 386.266 is January 1, 2006, not August 28, 2005. § 386.266.12.

ing with dynamic environmental compliance costs. It is with this understanding of the legislature's plain intent that we discuss the claims of error on appeal.

## I.

■ OPC and MIEC argue that the Regulations are unlawful because they claim the ECRM rules were promulgated after the grant of rulemaking authority had expired. Specifically, OPC and MIEC contend that section 386.266.9, in conjunction with section 386.266.12, required the PSC to promulgate the ECRM rules no later than January 1, 2006, and that the Regulations were not promulgated within one hundred fifty days after the initiation of the rulemaking proceeding.

With respect to the first "timing" issue, section 386.266.9 states that:

*[p]rior to August 28, 2005, the commission shall have the authority to promulgate rules under the provisions of chapter 536 as it deems necessary.*

Section 386.266.12 states that:

*[t]his section shall take effect on January 1, 2006, and the commission shall have previously promulgated rules to implement the application process for any rate adjustment mechanism under this section **prior to the commission issuing an order for any rate adjustment.***

(Emphasis added.) When those two sections are read in conjunction, OPC and MIEC insist that section 386.266.9 required the PSC to promulgate the ECRM rules no later than January 1, 2006.

We first note that OPC and MIEC's reading of section 386.266.12 ignores the latter part of the sentence. Section 386.266.12 contains two distinct clauses: (1) "the provisions of this section shall take effect on January 1, 2006," and (2) "the commission shall have previously promul-

gated rules to implement the application process for any rate adjustment mechanism under this section ***prior to the commission issuing an order for any rate adjustment.***" (Emphasis added.) Because subsection 12 plainly and unambiguously requires the PSC to promulgate the ECRM rules prior to issuing an order for an ECRM *rate adjustment,* not prior to January 1, 2006, statutory construction is unnecessary.

■ In addition, OPC and MIEC's interpretation of section 386.266.9 is simply wrong as a matter of law. Their interpretation attempts to give the statute substantive effect before its effective date. Yet, a statute has no legal force whatsoever until its effective date. *Levinson v. City of Kansas City,* 43 S.W.3d 312, 316 (Mo.App. W.D.2001). Although a statute may have a "potential existence" before its effective date, " 'no rights may be acquired under it and no one is bound to regulate his or her conduct according to its terms.' " *Id.* at 317 (quoting 82 C.J.S. Statutes § 388). Further, all acts purporting to have been done under the statute prior to its effective date are void. *Id.* In general, "where a constitutional provision prescribes the date at which an act of the legislature shall take effect, until the arrival of that date, it has no force or validity for any purpose whatever; not even for the purpose of imparting notice of its existence." *Keane v. Cushing,* 15 Mo.App. 96, 99 (1884), *overruled on other grounds by City of Springfield, to Use of Cent. Nat'l. Bank v. Weaver,* 137 Mo. 650, 37 S.W. 509, 511 (1896).

■ Based upon these legal principles, OPC and MIEC's argument that rulemaking authority only existed *prior* to January 1, 2006 (the statute's effective date), results in an illogical and absurd result. The statutory language upon which they rely was not yet in effect, had no legal force or

validity, and did not even impart notice of its existence until January 1, 2006. Section 386.266.9, therefore, could not have granted the PSC rulemaking authority prior to January 1, 2006. Moreover, had the PSC attempted to use section 386.266.9 as a basis for promulgating rules prior to January 1, 2006, the resulting regulations would have been void. Because statutory construction "should avoid unreasonable or absurd results," *Reichert v. Bd. of Educ. of St. Louis*, 217 S.W.3d 301, 305 (Mo. banc 2007), the PSC's statutory authority could not have *ended* on January 1, 2006; instead, it *began* on January 1, 2006.

We also note that express rulemaking authority exists in at least two other statutes, independent of section 386.266 (sections 386.250 and 393.140). And, not so coincidentally, the PSC's Order of Rulemaking in the instant case expressly refers to its authority for rulemaking as being vested under *all three statutes*. Therefore, even if OPC and MIEC's restrictive reading of section 386.266 had any merit whatsoever (though it does not), it would only mean that the PSC could not rely on the specific rulemaking authority contained in section 386.266.9 after January 1, 2006. It would not mean that the PSC could not use its rulemaking authority under sections 386.250(6) or 393.140(11) to promulgate rules after January 1, 2006.[10]

With respect to the second "timing" issue, section 386.266.9 states:

*Such rules shall be promulgated no later than one hundred fifty days after the initiation of such rulemaking proceeding.*

(Emphasis added.)

 OPC and MIEC argue that the initiation of the rulemaking proceeding began on December 17, 2008, when the PSC filed a Notice Opening Case and Finding Necessity. The PSC, therefore, should have promulgated the Regulations by May 16, 2009, or the regulations would be void. OPC and MIEC contend that the Regulations were not promulgated until the Secretary of State published the final order of rulemaking in the *Missouri Register* on July 1, 2009, over a month and a half past the deadline. We disagree.

Pursuant to section 536.021,[11] an agency's rulemaking procedure begins by the filing of a notice of proposed rulemaking with the Secretary of State and ends with the filing of a final order of rulemaking with the Secretary of State. § 536.021.1 ("No rule shall hereafter be proposed, adopted, amended or rescinded by any state agency unless such agency shall first file with the secretary of state a notice of proposed rulemaking and a subsequent final order of rulemaking, both of which shall be published in the Missouri Register by the secretary of state as soon as practicable after the filing thereof in that office....").[12] Included in a notice of proposed rulemaking is a notice to file comments in support or opposition to the pro-

---

10. Section 386.250(6) extends the powers of the PSC "[t]o the adoption of rules ... which prescribe the conditions of rendering public utility service ... and billing for public utility service." Section 393.140(11) empowers the PSC to establish rules and regulations relating to any rate change in a utility's schedule.

11. The citation for section 536.021 is RSMo Cum.Supp.2010.

12. The rulemaking docket, as suggested by OPC and MIEC, is not the initiation of the rulemaking proceeding. This is evident from the discretionary language used in section 536.046—"Each agency *may* maintain a public rulemaking docket." (Emphasis added.) Stated another way, if a rulemaking docket were required to initiate the rulemaking proceeding, a docket would be mandatory, not discretionary.

posed rulemaking and a notice of the time and place of a hearing on the proposed rulemaking, if so ordered. § 536.021.2(5)–(6). Each of these notices must include a specified time, not less than thirty days after publication of the notice of proposed rulemaking in the *Missouri Register,* to file a comment or when the hearing will be held. Within ninety days after expiration of the time for filing statements or the date of the hearing, the state agency must file a final order of rulemaking with the Secretary of State.

Filing the final order of rulemaking with the Secretary of State is the final act taken by the public agency in the rulemaking process. The Secretary of State must then publish the final order in the *Missouri Register* "as soon as practicable after the filing thereof in that office." § 536.021.1. The statute places no specific time constraints on the Secretary of State to complete this task. We conclude that it is not plausible that the legislature intended for the validity of the PSC's rules to be contingent upon the action of the Secretary of State, whose actions the PSC has no control over.

Furthermore, while the word "promulgate" is not defined by statute, absent a statutory definition, the "primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute." *State ex rel. White Family P'ship v. Roldan,* 271 S.W.3d 569, 572 (Mo. banc 2008). Therefore, we look to the plain and ordinary meaning of such words as defined in the dictionary. *State v. Moore,* 303 S.W.3d 515, 520 (Mo. banc 2010) (citing *State v. Oliver,* 293 S.W.3d 437, 446 (Mo. banc 2009) ("In the absence of a statutory definition, words will be given their plain and

ordinary meaning as derived from the dictionary.")). The term "promulgate" means "to make (as a doctrine) known by open declaration" or "to make known or public the terms of (a proposed law)." [13]

Thus, it is evident that the phrase *"promulgate* no later than one hundred fifty days after the initiation of such rulemaking proceeding," as used in section 386.266.9, meant that the PSC had to make known by open or public declaration, the proposed terms of the Regulations within one hundred fifty days. Stated another way, the PSC was obligated to file a notice of proposed rulemaking with the Secretary of State, accept comments and/or hold a hearing on the proposed rulemaking, and file a final order of rulemaking with the Secretary of State within one hundred fifty days after filing a notice of proposed rulemaking.

The PSC filed its notice of proposed rulemaking for the Regulations on January 2, 2009. During March 2009 and April 2009, the PSC accepted comments and proposed changes from interested persons. On May 27, 2009, the PSC filed the final order of rulemaking for the Regulations with the Secretary of State. The PSC completed all steps necessary to promulgate the Regulations within one hundred fifty days.

The "timing" arguments of OPC and MIEC in their point on appeal are denied.

## II.

■ OPC and MIEC next argue that the PSC erred in adopting the Regulations because they argue the Regulations are contrary to section 386.266.4(1) in that the rate adjustment mechanisms provided for in the Regulations focus solely on environ-

---

**13.** Promulgate Definition, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/ promulgate (last visited Jan. 18, 2011).

mental costs without consideration of the overall rates and charges of the utility and, therefore, enable earnings in excess of a fair return on equity.[14] Similarly, OPC and MIEC contend that the Regulations are contrary to section 386.266.4(2)'s requirement of an annual "true-up" to undo over- or under-collection of revenues from consumers because the "true-up" provisions provided for in the Regulations focus solely on revenue attributable to recovery of environmental costs rather than revenue, resulting from the adjustment mechanism, that exceeds the revenue needed for the utility to earn its fair return on equity.

In pertinent part, section 386.266 states:

2. Subject to the requirements of this section, any electrical ... corporation may make an application to the commission to approve *rate schedules authorizing periodic rate adjustments outside of general rate proceedings* to reflect increases and decreases in its prudently incurred costs, whether capital or expense, to comply with any federal, state, or local environmental law, regulation, or rule....

....

4. The commission shall have the power to approve, modify, or reject adjustment mechanisms submitted under subsections 1 to 3 of this section only after providing the opportunity for a full hearing in a general rate proceeding, including a general rate proceeding initiated by complaint. The commission *may approve such rate schedules after considering all relevant factors which may affect the costs or overall rates and charges of the corporation,* provided that it finds

that the adjustment mechanism set forth in the schedules:

(1) Is reasonably designed to provide the utility with a sufficient opportunity to earn a *fair return on equity;*

(2) Includes provisions for an *annual true-up* which shall accurately and appropriately remedy any over- or under-collections, including interest at the utility's short-term borrowing rate, through subsequent rate adjustments or refunds;

(3) [I]ncludes provisions requiring that the utility file a general rate case with the effective date of new rates to be no later than four years after the effective date of the commission order implementing the adjustment mechanism....

(4) [I]ncludes provisions for prudence reviews of the costs subject to the adjustment mechanism no less frequently than at eighteen-month intervals, and shall require refund of any imprudently incurred costs plus interest at the utility's short-term borrowing rate.

(Emphasis added.)

OPC and MIEC insist that the language "considering all relevant factors which may affect the costs of overall rates of a utility" applies not only to the general rate case, which establishes the rate schedule, but also to the periodic rate adjustments themselves. The Regulations, however, allow rate adjustments due to increased environmental compliance costs without consider-

14. In its Order of Rulemaking, the PSC stated: "Use of the ECRM must be authorized by the commission inside a rate case where the commission reviews *all* revenue and expenses. In the event the commission authorizes an ECRM, the commission has the ability to track all of those revenues and expenses, and to take action accordingly. Therefore, the commission finds that the proposed rules do not necessarily cause utilities to over-earn and, if a utility does over-earn, there are sufficient remedies available." (Emphasis added.)

ation of the utility's actual revenues and costs other than environmental costs at the time of the approval of the rate adjustment.[15] OPC and MIEC thus contend that this leads to over-earning by the utility.[16] We disagree with OPC's and MIEC's strained interpretation of section 386.266.

■■■ Section 386.266.2 explicitly authorizes "periodic rate adjustments *outside of general rate proceedings* to reflect increases and decreases in its prudently incurred costs, whether capital or expense, to comply with any federal, state, or local environmental law, regulation, or rule." (Emphasis added.) Section 386.266 is consistent with the Supreme Court's directive that "[i]f the legislature wishes to approve automatic adjustment clauses, it can of course do so by amendment of the statutes." *Util. Consumers Council of Mo.*, 585 S.W.2d at 57. Stated another way, section 386.266 permissibly authorizes a *single issue* ratemaking mechanism that allows periodic (automatic) adjustments outside a general rate case where other costs and revenues are *not* considered. In enacting S.B. 179 (section 386.266), the General Assembly understood the different roles between *single issue* ratemaking mechanisms and *full rate case* proceedings. The General Assembly understood that the role of full rate case proceedings is to set base rates upon a consideration of all relevant factors. The General Assembly understood that by enacting section 386.266, an ECRM mechanism could only first be established in a full rate case proceeding, at which time base rates

would be established upon a thorough review and consideration of "all relevant factors." §§ 386.266.2–4. The legislature "is presumed to know the state of the law and to pass only those statutes which have some effect or purpose," *State v. Rousseau*, 34 S.W.3d 254, 262 (Mo.App. W.D. 2000), and the legislature is presumed to have intended a change in existing law by enacting new statutes. *Kilbane v. Dir. of Dep't of Revenue*, 544 S.W.2d 9, 11 (Mo. banc 1976). Succinctly stated, section 386.266 authorizes a change in the law— that periodic *single issue* ratemaking mechanisms are authorized after first being established in a *full rate case* proceeding.

When approving an ECRM mechanism, the PSC must specifically conclude that the rate schedule provided for in the terms of the ECRM mechanism that it approves in the full rate case proceeding is "reasonably designed to provide the utility with a sufficient opportunity to earn a fair return on equity" and must also require that the rate schedule provides for annual true-ups of amounts collected under the ECRM versus the changes in the costs that are the subject of the ECRM, including interest on any over- or under-recoveries. §§ 386.266.2–4. By its plain terms, the "fair return on equity" and "considering all relevant factors" provisions of section 386.266 apply *only in connection with the* initial *full rate case* proceeding where the ECRM mechanism itself is established and base rates are set as well as each subsequent *full rate case* proceeding where the

---

15. *See* 4 CSR 240–20.091(1)–(5).

16. In theory, it may be possible for utilities to "over-earn." However, the risk of over-earning is not directly attributable to the PSC's approval of an ECRM. Environmental compliance costs recoverable through an ECRM are simply removed from consideration when setting the utility's base rates; the risk that a utility will over-earn based on erroneous pre-

dictions of the utility's *other* costs and revenues is the same as before approval of the ECRM. Moreover, when setting the utility's rate of return, the statutes and regulations allow the PSC to consider the decrease in the utility's overall business risk from the exclusion of environmental compliance costs as a factor. § 386.266.7; 4 CSR 240–20.091(2)(B).

continuing appropriateness of the ECRM mechanism is reviewed (no less than every four years). *Id.* Any other interpretation would rob the statute of its design for *single issue* ratemaking.

OPC and MIEC's arguments are, essentially, that we should interpret a *single issue* ratemaking mechanism to function as a *full rate case* proceeding and a failure to do so leads to "over-earning" and inadequate "true-ups." Their interpretation ignores both the legislative intent of section 386.266 and the plain language of the statute as discussed above.

When reading sections 386.266.2 and 386.266.4 together, it is evident that, while an initial application for an ECRM may be approved only as part of a general rate case in which all revenues and expenses of the utility are examined to set fair and reasonable rates, the legislature intended to allow the PSC to make interim rate adjustments for prudently incurred environmental compliance costs *without the need to consider any revenues and expenses other than those environmental costs.* Furthermore, because general rate cases can last up to eleven months, if all revenues and costs relevant to a utility's return on equity were required to be reviewed at every interim rate adjustment, the intent of an "interim" rate adjustment would be negated as this full review nearly amounts to a general rate case. The Regulations are consistent with the statutory directive. There is no conflict between section 386.266 and 4 CSR 240–3.162 and 4 CSR 240–20.091.

OPC and MIEC's points on appeal as to "over-earnings" and "true-ups" are denied.

### III.

■ Finally, OPC and MIEC argue that while the language used in the Regulations is "fairly similar" to that of section 386.266.2, the Regulations are unlawful and unreasonable in violation of section 386.266.2.

Section 386.266.2 provides in pertinent part:

> Any rate adjustment made under such rate schedules shall not exceed an annual amount equal to two and one-half percent of the electrical, gas, or water corporation's Missouri gross jurisdictional revenues ... for regulated services as established in the utility's most recent general rate case or complaint proceeding.... *Any costs not recovered as a result of the annual two and one-half percent limitation on rate adjustments may be deferred, at a carrying cost each month equal to the utilities net of tax cost of capital, for recovery in a subsequent year or in the corporation's next general rate case or complaint proceeding.*

(Emphasis added.) The ECRM rules incorporate the statutory cap at 4 CSR 240–20.091(4)(C), which states:

> (C) Any periodic adjustment made to ECRM rate schedules shall not generate an annual amount of general revenue that exceeds two and one-half percent (2.5%) of the electric utility's Missouri gross jurisdictional revenues established in the electric utility's most recent general rate proceeding.
>
> 1. Missouri gross jurisdictional revenues shall be the amount established in the electric utility's most recent general rate proceeding and exclude gross receipts tax, sales tax, and other similar pass-through taxes not included in tariffed rates for regulated services;
>
> 2. The electric utility shall be permitted to collect any applicable gross receipts tax, sales tax, or other similar pass-through taxes, and such taxes shall not be counted against the two and one-

half percent (2.5%) rate adjustment cap; and

3. Any environmental costs, to the extent addressed by the ECRM, not recovered as a result of the two and one-half percent (2.5%) limitation on rate adjustments may be deferred, at a carrying cost each month equal to the utility's net of tax cost of capital, for recovery in a subsequent year or in the utility's next general rate proceeding.

Though the above excerpts from the text of the Regulations compared to section 386.266.2 are "fairly similar," OPC and MIEC complain that the Staff's interpretation of the Regulations provided during the comment period suggest that, in the opinion of OPC and MIEC, the PSC will likely unlawfully permit deferral of amounts in excess of the annual two and one-half percent limitation. In support thereof, OPC and MIEC point to the following PSC summary of Staff interpretation of the annual two and one-half percent limitation:

> Staff commented that the statute limits the ECRM to 2.5% of a utility's Missouri gross jurisdictional revenues in first year; in the second year, an additional 2.5% is permitted and so forth for all four years. The most the rates could increase would be 10%, based on the statutory language "shall not exceed an annual amount" meaning that each year's maximum ECRM amount cannot exceed 2.5%.

■ However, Staff interpretations provided during the comment period do *not* constitute rules and are *not* incorporated into the rules unless expressly done so by the PSC in its final order of rulemaking. *See, e.g., State ex rel. City of Springfield v. Pub. Serv. Comm'n,* 812 S.W.2d 827, 833 (Mo.App. W.D.1991), *overruled on other grounds by Mo. Mun. League v. State,* 932 S.W.2d 400 (Mo. banc 1996); § 536.021.6(4); § 536.026. Accordingly, absent such express incorporation of Staff interpretations into the final order of rulemaking, comments made by the Staff during the comment period *cannot* be relied upon to attempt to invalidate the Regulations.

Because the PSC did *not* incorporate the above Staff interpretation into its final order of rulemaking in the instant proceeding, OPC and MIEC *cannot* use such Staff comments to attempt to invalidate the Regulations. If, in the future, the PSC unlawfully applies the Regulations in a manner contradictory to section 386.266, OPC and MIEC may challenge the PSC's *action* at that time. Point denied.

## Conclusion

The Regulations are lawful and reasonable as promulgated by the PSC. Accordingly, we affirm.

THOMAS H. NEWTON, Judge, and ALOK AHUJA, Judge, concur.