PRAXAIR, INC.; Office of Public Counsel, Appellants,

v.

PUBLIC SERVICE COMMISSION OF THE STATE of Missouri; Empire District Electric Company, Respondents.

Nos. WD 72119, WD 72120.

Missouri Court of Appeals, Western District.

Aug. 2, 2011.

David Lee Woodsmall, Jefferson City, MO and Lewis Robinson Mills, Jr., Jefferson City, MO, for appellants.

Steven Carroll Reed and Jennifer Leigh Heintz, Jefferson City, MO; Diana C. Carter, Jefferson City, MO, for respondents.

Before Division One: THOMAS H. NEWTON, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

The Appellants in this case sought judicial review in Cole County Circuit Court of the decision of the Public Service Commission authorizing a general rate increase for the Empire District Electric Company and also allowing the implementation of a "fuel adjustment clause," pursuant to section 386.266.1, RSMo Cum.Supp.2009. The circuit court affirmed the Commission's Report and Order, dated July 30, 2008. This appeal is brought pursuant to section 386.540, RSMo 2000.

The Appellants are the Office of Public Counsel (OPC)[1] and two industrial consumers of electric power, Praxair, Inc., and Explorer Pipeline Company (hereafter collectively, "the Industrials"). The Appellants do not challenge the decision of the Commission to allow a general rate increase. Rather, the Appellants challenge the approval by the Commission of the fuel adjustment clause, contending it was prematurely considered.[2] Further, they object to the fact that the fuel adjustment clause allows the utility a 95% pass-through. They believe that a lower pass-through rate was supported in the evidence *and* that the higher level was not. The issues thus presented focus on the record evidence and the law relevant to the allowance of the fuel adjustment clause and the relative rate of pass-through.

1. The Office of Public Counsel is established by section 386.700. The Public Counsel is charged with the responsibility, *inter alia*, of "represent[ing] and protect[ing] the interests of the public in any proceeding before or appeal from the public service commission[.]" Section 386.710.1(2).

2. Section 386.266.1 provides as follows:

   Subject to the requirements of this section, any electrical corporation may make an application to the commission to approve rate schedules authorizing an interim energy charge, or periodic rate adjustments outside of general rate proceedings to reflect increases and decreases in its prudently incurred fuel and purchased-power costs, including transportation. The commission may, in accordance with existing law, include in such rate schedules features designed to provide the electrical corporation with incentives to improve the efficiency and cost-effectiveness of its fuel and purchased-power procurement activities.

   The parties describe a "fuel adjustment clause" as a "mechanism that allows an electrical utility to make periodic rate adjustments outside of a general rate proceeding" that accords with changes in its prudently incurred fuel and purchased-power costs.

The OPC and the Industrials filed separate briefs. All Appellants contend, however, that the Commission was precluded from allowing Empire District Electric Company the benefit of a fuel adjustment clause in this case because of a binding stipulation preventing Empire District Electric Company from requesting a fuel adjustment clause during the time that an "interim energy charge" was in effect.[3] Further, the Industrials contend that section 386.266.8 precludes the Commission from prematurely terminating the previously allowed interim energy charge ("IEC").

The OPC also contends that the Commission erred in allowing the fuel adjustment clause to include a "95% pass-through" because such authorization was not supported by adequate findings of fact on the whole record.

## Standard of Review

■■■ This court reviews the decision of the Commission (not the ruling of the circuit court) to determine whether the Commission's ruling is both lawful (within the statutory authority of the Commission) and reasonable (supported by substantial and competent evidence on the whole record). *See State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n,* 289 S.W.3d 240, 246–47 (Mo.App.2009). This court's determination of lawfulness is made *de novo,* without deference to the views of the Commission or the circuit court. *See State ex rel. Aquila, Inc. v. Pub. Serv. Comm'n,* 326 S.W.3d 20, 22 (Mo.App.2010). A Commission ruling is reasonable if it is supported by competent and substantial evidence on the whole record and is not arbitrary, capricious, or an abuse of discre-

tion. *Office of Pub. Counsel,* 289 S.W.3d at 246. This court, in considering the factual record, does not substitute its judgment as to credibility determinations. *Id.* at 247.

■■■ The Commission's task is to determine whether the rates and mechanisms proposed are just and reasonable. *See* section 393.150.2. In determining whether a Commission ruling related to rates is "just" and "reasonable," we consider whether the evidence indicates that the decision is fair to both the company and its customers. *State ex rel. Valley Sewage Co. v. Pub. Serv. Comm'n,* 515 S.W.2d 845, 850 (Mo.App.1974). The ratemaking function involves the making of "pragmatic adjustments." *State ex rel. Assoc. Natural Gas Co. v. Pub. Serv. Comm'n,* 706 S.W.2d 870, 873 (Mo.App.1985).

## Factual Background

Empire District Electric Company (hereafter "Electric Company") is an investor-owned public utility providing service to approximately 147,000 customers in southwest Missouri. Section 393.140(11), RSMo 2000, gives the Commission the authority to regulate the rates charged by public utilities. *See also* section 386.250(1). On October 1, 2007, Electric Company filed its tariff seeking a rate increase of $34.7 million per year. The Commission suspended the tariff until August 28, 2008. "The Industrials" were allowed to intervene in the case. After public hearings, the evidentiary hearing before the Commission was conducted in May 2008.

On July 30, 2008, the Commission issued its Report and Order granting a rate in-

---

**3.** The "interim energy charge" was intended to "resolve [certain] fuel and purchased power expense[s] ... by [including] a certain level of recovery of those expenses in [the utility's] permanent rates, not subject to refund, and

recovery of an additional amount on an interim basis, subject to true-up and refund[.]" *See State ex rel. Praxair, Inc. v. Pub. Serv. Comm'n of the State of Mo.,* 328 S.W.3d 329, 343 (Mo.App.2010).

crease with a fuel adjustment clause. The OPC and the Industrials filed applications for rehearing, which were denied by the Commission. Thereafter, the Appellants filed their petitions for judicial review in Cole County Circuit Court. The circuit court affirmed the ruling of the Commission.

In its Report and Order, the Commission considered such matters as Electric Company's capital structure and the need for a just and appropriate return on equity sufficient to attract and keep investors. The Commission considered the expert testimony presented by Electric Company and by the Industrials, and the expert testimony provided by its own staff. The Commission noted that, according to the record, Electric Company is a "riskier" investment than most utility companies. No party makes it a point to dispute that observation. Electric Company has a BBB-bond rating from Standard and Poor's. The Commission considered the needs of Electric Company, an integrated utility, and the rates of return on equity allowed other integrated utilities. The Commission also considered, *inter alia*, that between 2002 and 2006, Empire's shareholders absorbed $85.5 million in fuel and power costs that were not recoverable in rates. The Commission stated that there "really is no dispute that the implementation of a fuel adjustment clause will reduce the level of operating risk that Empire faces."

The production of electrical power requires the purchase and consumption of the sources of electrical power, such as natural gas and coal. Because the regulatory process is slow to respond to volatility in fuel prices, the efficiency of electrical utilities can be hampered when there are no mechanisms that are utilized to more promptly respond to price fluctuations. In an earlier Electric Company rate case, the Commission had allowed Electric Company the benefit of a fuel and purchased-power expense recovery mechanism referred to as an "interim energy charge" or IEC. In that earlier case, these same parties prepared and filed a stipulation whereby the parties agreed that, in return for the allowance of an IEC, Electric Company would forego any right to request a fuel adjustment clause until the termination of the three-year period during which the IEC was to be in effect.

The stipulation, dated February 22, 2005, and signed by the parties to this appeal (Electric Company, OPC, and the Industrials), provides that the parties have agreed among themselves to include in Electric Company's rates a specific annual amount of Electric Company's fixed and variable fuel and purchased-power costs and to provide for recovery of an additional amount of such costs on an interim basis, subject to "true-up and refund." The parties agreed that the IEC would be in effect for three years. Among the many provisions related to the implementation of the agreement concerning the IEC, was the following paragraph:

In consideration of the implementation of the IEC in this case and the agreement of the Parties to waive their respective rights to judicial review or to otherwise challenge a Commission order in this case authorizing and approving the subject IEC, for the duration of the IEC approved in this case [Electric Company] agrees to forego any right it may have to request the use of, or to use, any other procedure or remedy, available under current Missouri statute or subsequently enacted Missouri statute, in the form of a fuel adjustment clause, a natural gas cost recovery mechanism, or other energy related adjustment mechanism to which the Company would otherwise be entitled. [Electric Company] also agrees not to request an Accounting Authority Order

or other regulatory mechanism to accumulate and or recover any amount of variable fuel and purchased power cost that exceeds the IEC ceiling.

The stipulation stated that it was contingent upon the approval thereof by the Commission "unconditionally and without modification." .

On March 21, 2005, the Commission approved tariff sheets implementing the rate increase and the IEC. The Commission also approved the stipulation. Less than a year later, in February 2006, Electric Company filed tariff sheets to implement a general rate increase. Electric Company also at that time sought to terminate the IEC and to implement a fuel adjustment clause instead. The Commission declined to consider the request to implement a fuel adjustment clause. On May 2, 2006, the Commission stated that Electric Company may not seek a fuel adjustment clause while the IEC is in effect.

Seven months later, on December 21, 2006, the Commission reversed course, stating that it intended to terminate the IEC. The Commission sought to quickly approve Electric Company's tariff sheets, including the sheet terminating the IEC. The Commission's Order approving tariff sheets was entered December 29, 2006, and called for the rates to become effective January 1, 2007. The OPC at that point sought a writ of mandamus to compel the Commission to vacate its December 29, 2006 Order, because it had not allowed the parties a reasonable time to file an application for rehearing. The writ of mandamus was granted by the Supreme Court requiring the Commission to vacate its December 29, 2006 Order approving the tariff sheets. The Commission then issued an Order purporting to vacate its December 29 Order. The Commission, however, "reiterated" its earlier finding "that [Electric Company's] December 28, 2006 tariff sheets comply with the December 21, 2006 Report and Order. This order fully complies with the Supreme Court's mandate to vacate [the Commission's] previous order and to provide the parties with the opportunity to seek rehearing if they choose to do so."

The OPC again sought a writ of mandamus on the ground that the Commission had not truly vacated its earlier Order. In response to that application for a writ, the Court stated:

The general rule is that when an order or judgment is vacated, the previously existing status is restored and the situation is the same as though the order or judgment had never been made. The matters in controversy are left open for future determination. In this case, the commission sought to do more than restore the existing status but also to determine the effect on those moneys collected under the tariffs the commission had previously approved. Such action exceeds this Court's mandate.

*State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n of Mo.*, 266 S.W.3d 842, 843 (Mo. banc 2008) (internal citation omitted).

The Appellants argue that because of the Supreme Court ruling at the time Electric Company filed case no. ER2008–0093 (October 1, 2007), the IEC was still in effect. This, says the Appellants, means that Electric Company was in violation of the stipulation in requesting a fuel adjustment clause. Appellants say this also means that the Commission lacked authority to grant a fuel adjustment clause—because Electric Company was bound by stipulation not to request such a provision.

In the tariff sheets filed October 1, 2007, Electric Company sought a general rate increase and, as we have noted, a fuel adjustment clause. While the rate determination was pending, the IEC stipulation expired by its own terms (on March 27, 2008).

After the intervention of additional parties, the pre-filing of testimony, and an evidentiary hearing, the Commission issued its July 30, 2008 Report and Order, which is the specific subject of this appeal. In that decision, the Commission authorized a general rate increase and also implemented a fuel adjustment clause. The Commission noted that the IEC expired earlier. The Commission determined it would be contrary to the public interest to deny a fuel adjustment clause in this case. Thereafter, Electric Company filed new tariff sheets in an effort to comply with the July 30 decision. The OPC timely sought rehearing. On August 12, the Commission approved the tariff sheets for service on and after August 23.

After denial of its application for rehearing, the OPC sought judicial review. On December 31, 2009, the circuit court affirmed the Commission's decision in all respects.

### The Industrials' Appeal

■ In the point raised by Praxair and Explorer Pipeline, these industrial consumers contend that the Commission erred in its decision in that section 386.266.8 precludes the Commission from "prematurely terminating an incentive based plan." The stipulation between the parties provided for the IEC to have a three-year term that would expire March 27, 2008. The IEC expired several months before the July 30, 2008 Report and Order. Thus, the Commission did not prematurely terminate the IEC. Nevertheless, the Industrials contend that the statutory provision absolutely bars the action taken by the Commission.

The pertinent statutory subsection says: In the event the commission lawfully approves an incentive- or performance-based plan, such plan shall be binding on the commission for the entire term of the plan. This subsection shall not be construed to authorize or prohibit any incentive- or performance-based plan.[4] Section 386.266.8. On its face, the plain terms of subsection .8 do not bar the adoption by the Commission of the fuel adjustment clause in this case, because it was not adopted until after the expiration or termination of the IEC. The Industrials incorporate the stipulation into their argument, however, pointing out that Electric Company was prohibited, under the *stipulation,* from *requesting* a fuel adjustment clause while the IEC was in effect. They argue that, therefore, the Commission was bound to continue the IEC, not only until it expired, but also until it was *thereafter* lawfully terminated by the Commission. They argue that the combined effect of the statutory provision and the stipulation was that Electric Company could not even *request* termination of the IEC and the adoption of another incentive plan, and the Commission accordingly could not *authorize* such termination or adoption, until after the IEC had fully expired by its own terms. Thus, say the Industrials, the ruling of July 30, 2008 (authorizing the fuel adjustment clause) came before such a ruling could lawfully be accomplished and, thus, was void. The Industrials argue, in effect, that the Commission was required

---

4. The parties dispute whether the IEC was an "incentive- or performance-based plan." The testimony indicated the IEC had a "ceiling" that provided an incentive for the company to keep its fuel expense and purchased-power expense below that ceiling. According to the Commission, the ceiling was too low— so low that Electric Company could not recover its rising fuel expenses under the rates, even with the IEC. The Commission thus believes the IEC should not be considered an incentive-based or performance-based plan. We need not decide that issue because we decide herein for other reasons that the Commission was not precluded from terminating the IEC when it did.

to enforce the stipulation and that it exceeded its authority in failing to do so.

The Commission, in response, first points out that section 386.266 did not become effective until January 1, 2006. Section 386.266.12, RSMo Cum.Supp.2009. The Act is presumed to operate prospectively, *see Wellner v. Director of Revenue*, 16 S.W.3d 352, 354 (Mo.App.2000), and nothing suggests that the statute was intended to have any retrospective effect as to incentive mechanisms previously adopted. In *State ex rel. Praxair, Inc. v. Public Service Commission*, 328 S.W.3d 329, 343–44 (Mo.App.2010), this court pointed out that section 386.266.10 provides that, "[n]othing contained in this section shall be construed as affecting *any existing adjustment mechanism ...* currently approved and in effect." (Emphasis added.) This court has thus already determined that the statutory prohibition against early termination of an incentive mechanism (set forth in section 386.266.8) had no impact on the Commission's statutory authority in this case to terminate the IEC any time it believed it to be in the public interest to do so. *Id.* at 344–45. Subsection .8 did not bind the Commission to continue the IEC in this case for any specific period.

To the extent that Appellants argue that the parties' stipulation binds the Commission, we note that the stipulation provided that the IEC would remain in effect as specified unless "earlier terminated by order of the Commission." Because the Commission had the authority to terminate the IEC prior to its expiration, and the fuel adjustment clause was not adopted until after the IEC expired, the Commission's actions could not amount to a premature termination of the IEC.

### The 95% Pass–Through

■ The Appellants also contend that the Commission abused its discretion in allowing Electric Company a 95% pass-through incentive mechanism.

The Commission determined in this case to allow a fuel adjustment clause providing that 95% of any deviation in fuel and purchased-power costs "from the base level agreed to by the parties"[5] is to be passed to Electric Company's customers, with five percent retained by Electric Company. The Commission found that this mechanism would provide Electric Company an opportunity to earn a "fair return on equity," while at the same time protecting Electric Company's customers by giving the company an incentive to be prudent in its decisions. Section 386.266. An electric utility operating with a fuel adjustment clause must file a new rate case every four years; and the prudence of the company's purchasing decisions are to be reviewed every eighteen months, with a refund required as to the utility's *imprudently* incurred costs. See sections 386.266.4(3) and (4).

The Commission points out that because general rate proceedings are cumbersome and expensive, it is important to have an "adjustment outside of general rate proceedings to reflect increases and decreases in its prudently incurred fuel and purchased-power costs, including transportation."

The Commission reminds us that any adjustment mechanism adopted by the Commission shall be "reasonably designed to provide the utility with a sufficient opportunity to earn a fair return on equity." Section 386.266.4(1). A fair return on equity is what will attract investors; and without investors a utility may be starved

5. The parties agree the base level and the normalized fuel and purchased-power costs estimated in this case were $174.3 million for the calendar year 2008.

for the ability to invest in capital improvements, resulting ultimately in less efficiency. The Commission also reminds us that it determined the evidence showed that between 2002 and 2006, Electric Company's shareholders absorbed $85.5 million in fuel costs that Electric Company could not collect in rates. We have not noted that the Appellants disputed that factual assertion.

The Commission reached the conclusion to adopt the fuel adjustment clause with a 95% pass-through only after considering the positions and arguments of OPC, the Industrials, Electric Company, and its own staff. Electric Company requested a pass-through of 100%. The OPC and the Commission staff requested lower pass-throughs of 60% and 70%, respectively.

The Commission reported that approximately seventeen states do not have fuel adjustment mechanisms because they have passed some form of deregulation allowing wholesale electric generators to recover those costs. Of the states that have fuel adjustment clauses, the evidence, according to the Commission, is that the majority have 100% pass-through provisions. Other states that have less than 100% generally have a rate in the range of 80–95%, according to the Commission.

The Commission pointed out that in 2006, fuel and purchased-power costs increased by over $44 million. If costs increased another $20 million, a five percent absorption of those costs by Electric Company would cost Electric Company $1 million, an amount equal to three percent of Electric Company's net earnings.

The Commission staff recommended a pass-through of between 60% and 80%, with a specification of 70% as optimum. The Industrials presented a more complicated plan that would involve a $1.2 million symmetrical "dead band margin" followed by symmetrical sharing bands of 90% (for the first $6 million) and 80% (for the next

$6 million), and then, for expenditures beyond that amount, the pass-through would be 100%. The Industrials in their rebuttal presented a variation on this plan that would involve a 90–95% pass-through at the highest level of expenditures. The Industrials would cap the maximum impact on Electric Company's shareholders at $3 million.

The Commission's desire was to ensure that Electric Company has a chance to earn a fair return on equity while paying close attention to efficiency in its fuel and purchased-power costs.

OPC attacks the Report and Order of the Commission on the basis that the Commission found it "particularly relevant" that the "vast majority of other states that use fuel adjustment clauses allow 100% pass-through of fuel costs." OPC states that this finding is not supported in the record. The Commission, in its brief, states that this finding was based partially on the testimony of Maurice Brubaker, a regulatory expert witness for the Industrials, whom the Commission noted "could only identify four other states besides Missouri that had ever allowed less than a 100% pass-through" of fuel and purchased-power costs. The Commission also states that its finding was based upon evidence introduced by Dr. H. Edwin Overcast, a national regulatory economist who testified on behalf of Electric Company. Dr. Overcast introduced a table classifying certain fuel and power cost incentive mechanisms applied to companies comparable to Electric Company. Dr. Overcast testified that "when less than 100% pass-through of costs is allowed ... other states usually allow a fairly high rate of pass-through ... in the 80 to 90, 95% range." He thus arguably implied that the typical pattern of pass-through is 100%.

The Commission also points to its finding that requiring Electric Company to

absorb five percent of excess fuel costs above the base level is sufficient to improve the efficiency and cost-effectiveness of its purchasing while allowing the company to "actually earn the return on equity awarded by this Commission."

The Commission rejected OPC's recommendation of a 60% pass-through, and its own staff's recommendation of a 70% pass-through, believing that such would not be adequate if "as expected, fuel costs rapidly rise." The Commission believed that such a low pass-through would deter the company's ability to attract investment at a time when the company "needs tens of millions of dollars in new capital investment." The Commission entertained the proposal of the Industrials for a "symmetrical dead band margin," but rejected it on the basis of its "unnecessary complexity."

The Commission was free to give weight to portions of the testimony of Mr. Brubaker and Dr. Overcast, a regulatory economist, in reaching the conclusion that Electric Company should be allowed a 95% pass-through.

OPC argues that the exhibit prepared by Dr. Overcast does not demonstrate, as the Commission found, that the "vast majority of states allow 100% pass-through of fuel costs." The exhibit was an attempt by Dr. Overcast to show that many companies that are comparable in position to Electric Company and located in various states have fuel adjustment clauses (subject, of course, to periodic prudence review). Some have fuel adjustment clauses and "other regulatory cost adjustment features." While it may be an overstatement to believe that the Overcast exhibit also establishes that the "vast majority of states allow 100% pass-through of fuel costs," we cannot say that it is *not* true that the "vast majority" allow total pass-through. We also cannot say it was arbitrary or capricious for the Commission to

reach the conclusion that the 100% pass-through was relatively normative.

The Commission also mentions an exhibit prepared by the Industrials' witness Brubaker at the request of Electric Company's counsel. At the hearing, Brubaker testified he was aware of several state utility commissions that allowed pass-throughs of less than 100%. When asked to provide a list of the utilities of which he was aware that allowed less than 100%, he provided a list of utilities in four different states that allow a pass-through of less than 100%. The conclusion one draws from this exhibit may depend in part upon the extent to which one believes that Brubaker is knowledgeable as a national regulatory expert. The conclusion may also be influenced by data commonly available to regulatory Commissioners. It certainly cannot be said to be categorically unreasonable for the Commission to conclude that all but four states allow a 100% pass-through.

Finally, OPC challenges the finding of the Commission that fuel costs are "expected to rapidly rise" and contends that the Commission rejected the lower proposed pass-through proposals on this expectation. OPC points out that there was no such testimony in the record as to the expected rapid rise of fuel costs.

We understand OPC's complaint in this regard, but we fail to see that this complaint would be a proper basis on which to disturb the Commission's findings or to reject its Report and Order. For one thing, fuel adjustment clauses not only potentially increase the cost to the consumer by passing along increases in the cost of fuel, but they also, in times of volatile fuel prices, can periodically decrease the cost to the consumer by passing on savings from the base level. This means that whether or not it is reasonable to expect rapidly rising costs of power sources, the fact is that it is not necessary that there be

rapidly rising power costs for the fuel adjustment clause to be a legitimate regulatory mechanism.

The Commission's anticipation of a continuation of rising fuel prices cannot be called arbitrary and capricious in view of the fact that the four-year period before the Commission's Order was a period of rising prices. The Commission, like everyone else, knows that projecting the cost of coal, natural gas, and other power sources tends to involve uncertainty, even if there has been more stabilization recently in natural gas. Everyone, including utilities, wants to know what will happen with the cost of power sources. It is safe to say that no one knows with any certainty. That, in fact, is the whole reason for fuel adjustment clauses. If a fuel adjustment clause is justified, then a high pass-through is arguably normative, especially as to a utility that has endured years of losses, is considered "risky" in relation to other utilities by the capital markets, and is in need of attracting additional capital to perform more efficiently. The Commission, in rejecting the proposals for the 60% pass-through and the 70% pass-through, simply noted that such lower pass-through rates would not be adequate to reduce the risk to the utility if, as expected, fuel costs rapidly rise. That can be called neither arbitrary and capricious nor an abuse of discretion.

The record here simply does not demonstrate that the Commission can be said to have been necessarily right or wrong in choosing a 95% pass-through as the optimum level of pass-through in this instance. The record does demonstrate, however, that the decision of the Commission was within the Commission's statutory authority, was reasonable because it was supported by competent and substantial evidence, and was not arbitrary, capricious, or an abuse of discretion.

## Conclusion

For all the foregoing reasons, we affirm the decision of the Commission.

All concur.