STATE of Missouri, EX REL., MISSOURI ENERGY DEVELOPMENT ASSOCIATION, Respondent,

State of Missouri, ex rel., Missouri Industrial Energy Consumers, Respondent,

State of Missouri, ex rel., The Empire District Electric Company, Respondent,

State of Missouri, ex rel., Union Electric Company, d/b/a Amerenue, Respondent,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Appellant.

No. WD 74896.

Missouri Court of Appeals, Western District.

Nov. 20, 2012.

Edward F. Downey, Jefferson City, for Respondent Missouri Industrial Energy Consumers.

Paul A. Boudreau, Jefferson City, for Respondent Missouri Energy Development Association.

Jennifer L. Heintz, for Appellant Missouri Public Service Commission.

Before Division Three: ALOK AHUJA, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

VICTOR C. HOWARD, Judge.

The Missouri Public Service Commission (PSC) appeals the judgment of the circuit court reversing its revised final order of rulemaking adopting 4 CSR 240–20.100, which implemented the Renewable Energy Standard in Missouri. The circuit court's judgment is reversed, and the PSC's revised final order of rulemaking is affirmed.

**Factual and Procedural Background**

The PSC is the state agency responsible for the regulation of investor-owned utili-

ties, including electric corporations, under Chapters 386 and 393, RSMo. Missouri Industrial Energy Consumers (MIEC) is a group consisting of large retail electric customers. Missouri Energy Development Association (MEDA) is a group consisting of investor-owned utilities. Union Electric Company d/b/a Ameren Missouri (Ameren) and Empire District Electric Company (Empire) are electric corporations subject to regulation by the PSC and are also members of MEDA.

In November 2008, Missouri voters approved Proposition C, the Renewable Energy Standard (RES). The RES is codified in sections 393.1020, 309.1025, and 393.1030, RSMo Cum.Supp.2011. It requires investor-owned electric utilities to meet a certain portion of their energy portfolio requirements with electricity from renewable energy resources. § 393.1030.1. Renewable energy resources include, but are not limited to, wind, solar thermal sources, waste to energy, and hydropower. § 393.1025(5). The RES provides that a utility may comply with the standard in whole or in part by purchasing renewable energy credits or RECs. § 393.1030.1. An REC is "a tradeable certificate of proof that one megawatt-hour of electricity has been generated from renewable energy sources." § 393.1025(4). The RES also provides for a maximum average retail rate impact of one percent. 393.1030.2(1). The legislation charges the PSC with promulgating rules "necessary to enforce the renewable energy standard." § 393.1030.2.

In December 2009, the PSC opened a case file to propose regulations to implement RES requirements. Thereafter, in January 2010, the PSC submitted a proposed rulemaking to the Missouri Secretary of State for publication in the Missouri Register. Interested parties were invited to submit written comments on April 5, 2010. The PSC received 267 comments from entities such as the PSC Staff, the Office of Public Counsel, regulated electric utilities, renewable energy producers, consumer groups, and environmental groups. In addition, twenty-nine witnesses testified at a public hearing the next day. In particular, MIEC, MEDA, Ameren, and Empire filed written comments regarding calculation of the retail rate cap and qualification of renewable energy credits or RECs for portfolio compliance requirements.

After the comment period and the hearing, the PSC transmitted an order of rulemaking to the Secretary of State and the Joint Committee on Administrative Rules (JCAR) on June 2, 2010. The JCAR held hearings on the regulation. On July 1, 2010, the PSC submitted a revised order of rulemaking to the Secretary of State. That same day, the JCAR informed the Secretary of State by letter that it voted to disapprove paragraphs (2)(A) and (2)(B)2 of 4 CSR 240–20.100, which contain provisions regarding geographic sourcing of RECs, and considered the paragraphs to be held in abeyance. On July 6, 2010, the PSC again submitted its revised order of rulemaking to the Secretary of State but stated that it was not filing the paragraphs disapproved by the JCAR for publication. Instead, it requested that the paragraphs be reserved and held in abeyance. The Secretary of State published the regulation in the Missouri Register and in the Code of State Regulations with the paragraphs (2)(A) and (2)(B)2 reading *"Reserved."* The PSC subsequently filed an order with the Secretary of State on January 26, 2011, withdrawing the geographic sourcing provisions and again asking that the provisions not be published or become effective. The General Assembly adopted a concurrent resolution upholding the JCAR's action disapproving paragraphs (2)(A) and (2)(B)2 on February 1, 2011.

MIEC, MEDA, Ameren, and Empire filed applications for rehearing in July 2010, which were denied. They then filed petitions for writ of review in the circuit court in August 2010. The circuit court reversed the PSC's revised final order of rulemaking finding the regulation unlawful and unreasonable and remanding the case to the PSC.

The PSC appealed the circuit court's judgment. But because this court reviews the PSC's decision, not the circuit court's judgment, *State ex rel. Office of Public Counsel and Mo. Indus. Energy Consumers v. Public Serv. Comm'n*, 331 S.W.3d 677, 682 (Mo.App. W.D.2011), MIEC, MEDA, Ameren, and Empire, the parties aggrieved by the PSC's order, assume the position as appellants on appeal pursuant to Rule 84.05(e). In various points on appeal, they claim that 4 CSR 240–20.100 is unlawful and unreasonable because it directly conflicts with section 393.1030 regarding the retail rate impact of the RES and the eligibility of RECs for portfolio compliance.[1]

### Standard of Review

On appeal from a PSC order of rulemaking, the appellate court must determine whether the order is lawful and reasonable. § 386.510, RSMo Cum.Supp. 2011; *State ex rel. Atmos Energy Corp. v. Public Serv. Comm'n*, 103 S.W.3d 753, 759 (Mo. banc 2003). An order is lawful if the PSC had the statutory authority to act as it did. *State ex rel. AG Processing, Inc.*

*v. Public Serv. Comm'n*, 120 S.W.3d 732, 734 (Mo. banc 2003); *Mo. Indus. Energy Consumers*, 331 S.W.3d at 682. "Because the PSC is purely a creature of statute, its powers are limited to those conferred by statute either expressly, or by clear implication as necessary to carry out the powers specifically granted." *Mo. Indus. Energy Consumers*, 331 S.W.3d at 682 (internal quotes and citation omitted). Convenience, expediency, and necessity are not proper matters for consideration in the determination of whether an act of the PSC is authorized by statute. *Id.* The determination of lawfulness is made de novo, without deference to the Commission. *Praxair, Inc. v. Public Serv. Comm'n*, 346 S.W.3d 377, 379 (Mo.App. W.D.2011). The PSC's ruling is reasonable if it is supported by competent and substantial evidence on the whole record and is not arbitrary capricious, or an abuse of discretion. *Id.*

The PSC's order is presumed to be valid. *State ex rel. Sprint Mo., Inc. v. Public Serv. Comm'n*, 165 S.W.3d 160, 164 (Mo. banc 2005). Administrative rules and regulations are to be sustained unless unreasonable and plainly inconsistent with the statute and will be overturned only for weighty reasons. *Foremost–McKesson, Inc. v. Davis*, 488 S.W.2d 193, 197 (Mo. banc 1972); *Purler–Cannon–Schulte, Inc. v. City of St. Charles*, 146 S.W.3d 31, 47 (Mo.App. E.D.2004). The burden is upon those challenging a regulation to show that it bears no reasonable relationship to the

---

1. The PSC initially asserts that the brief of MIEC, Ameren, and Empire violates Rule 84.04(c) and should be dismissed. It complains that the statement of facts is not fair and concise, is not relevant to questions on appeal, and is argumentative. Whether to dismiss an appeal for briefing deficiencies is discretionary, and that discretion is generally not exercised unless the deficiency impedes disposition on the merits. *Estate of Downs v.*

*Bugg*, 348 S.W.3d 848, 852–53 (Mo.App. W.D. 2011). A brief impedes disposition on the merits where it is so deficient that it fails to give notice to the court and the other parties as to the issue presented on appeal. *Englemeyer v. Mo. Real Estate Comm'n*, 302 S.W.3d 214, 215 (Mo.App. E.D.2009)(internal quotes and citation omitted). Such is not the case here, and we decline to dismiss the brief or appeal.

legislative objective. *Foremost–McKesson*, 488 S.W.2d at 197. "The interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." *Id. See also Sprint*, 165 S.W.3d at 164. Nonetheless, the appellate court exercises independent judgment and must correct erroneous interpretations of the law. *Sprint*, 165 S.W.3d at 164.

### Retail Rate Impact Provision

MIEC, MEDA, Ameren, and Empire first contend that 4 CSR 240–20.100(5), the retail rate impact provision, is unlawful, unreasonable, and arbitrary and capricious. They argue that the provision directly conflicts with section 393.1030 because it allows rate impacts from the RES that greatly exceed one percent.

Section 393.1030 sets out Missouri's Renewable Energy Standard (RES). It requires electric utilities to meet a certain portion of their energy portfolio requirements with electricity generated from renewable energy resources:

(1) No less than two percent for calendar years 2011 through 2013;

(2) No less than five percent for calendar years 2014 through 2017;

(3) No less than ten percent for calendar years 2018 through 2020; and

(4) No less than fifteen percent in each calendar year beginning in 2021.

§ 393.1030.1. The statute grants authority to the PSC to make rules as necessary to enforce these portfolio standards including a maximum average retail rate increase of one percent. § 393.1030.2(1). Specifically, section 393.1030.2(1) sets out the retail rate impact and the method for calculating it:

A maximum average retail rate increase of one percent determined by estimating and comparing the electric utility's cost of compliance with least-cost renewable generation and the cost of continuing to generate or purchase electricity from entirely nonrenewable sources, taking into proper account future environmental regulatory risk including the risk of greenhouse gas regulation.

Section 393.1030.2(4) further directs the PSC's rule to make a provision for recovery, outside of a rate case, of prudently incurred costs and pass-through of benefits to customers of savings achieved in complying with the RES.

The PSC addressed the one percent retail rate impact in 5(A) of 4 CSR 240–20.100:

The retail rate impact, as calculated in subsection 5(B), may not exceed one percent (1%) for prudent costs of renewable energy resources directly attributable to RES compliance. The retail rate impact shall be calculated on an incremental basis for each planning year that includes the addition of renewable generation directly attributable to RES through procurement or development or renewable energy resources owned or under contract prior to the effective date of this rule.

4 CSR 240–20.100(5)(A). Subsection (5)(B) describes how the retail rate impact is calculated:

The RES retail rate impact shall be determined by subtracting the total retail revenue requirement incorporating an incremental non-renewable generation and purchased power portfolio from the total retail revenue requirement including an incremental RES-compliant generation and purchased power portfolio. The non-renewable generation and purchased power portfolio shall be determined by adding to the utility's existing generation and purchased power resource portfolio additional non-renewable resources suffi-

cient to meet the utility's needs on a least-cost basis for the next ten (10) years. The RES-compliant portfolio shall be determined by adding to the utility's existing generation and purchased power resource portfolio an amount ·of renewable resources sufficient to achieve the standard set forth in subsection (2) of this rule and an amount of least-cost non-renewable resources, the combination of which is sufficient to meet the utility's needs for the next ten (10) years. These renewable energy resource additions will utilize the most recent electric utility resource planning analysis. These comparisons will be conducted utilizing projections of the incremental revenue requirement for new renewable energy resources, less the avoided cost of fuel not purchased for non-renewable energy resources due to the addition of renewable energy resources. In addition, the projected impact on revenue requirements by non-renewable energy resources shall be increased by the expected value of greenhouse gas emissions compliance costs.... The comparison of the rate impact of renewable and non-renewable energy resources shall be conducted only when the electric utility proposes to add incremental renewable energy resource generation directly attributable to RES compliance through the procurement or development of renewable energy resources.

4 CSR 240–20.100(5)(B). Subsection (5)(D) provides for a downward adjustment of renewable resources if the retail rate cap is exceeded and for recovery of prudently incurred costs related to RES compliance within or outside a normal rate proceeding:

For purposes of the determination in accordance with subsection (B) of this section, if the revenue requirement including the RES-compliant resource mix, averaged over the succeeding ten (10)-year period, exceeds the revenue requirement that includes the non-renewable resource mix by more than one percent (1%), the utility shall adjust downward the proportion of renewable resources so that the average annual revenue requirement differential does not exceed one percent (1%).... Prudently incurred costs to comply with the RES standard, and passing this rate impact test, may be recovered in accordance with section (6) of this rule or through a rate proceeding outside or in a general rate case.

4 CSR 240–20.100(5)(D).

MIEC, Ameren, and Empire contend that the PSC's concept of "averaging" in 4 CSR 240–20.100(5) grossly understates the true RES rate impact. Along the same lines, MEDA contends that 4 CSR 240–20.100(5) provides for ascertaining the retail rate impact based on an incremental analysis rather than a cumulative assessment, which will result in an actual retail impact as reflected on a customer's bill significantly in excess of the one percent cap specified in section 393.1030.2(1). MIEC, Ameren, and Empire also claim that 4 CSR 240–20.100(5) unreasonably understates the cost of the RES by double counting fuel and environmental compliance costs. Finally, MEDA argues that section 393.1030.2(1) requires a prospective analysis of certain costs and risks but that 4 CSR 240–20.100 is considered in current rate increases, which may frustrate full cost recovery in rates, and that the PSC's failure to resolve this discrepancy is a denial of fundamental due process in violation of the United States and Missouri Constitutions.

"Statutory construction is a matter of law." *Mo. Indus. Energy Consumers*, 331

S.W.3d at 683. The primary rule in construing a statute is to ascertain the intent of the legislature from the language used by considering the plain and ordinary meaning of the words used in the statute. *Id.* The purpose of the whole act must be considered, and it is presumed that the legislature intended every word, clause, sentence, and provision of the statute have effect and be given meaning. *Id.* at 683–84. Interpretation and construction of a statute by an agency charged with its administration is afforded great weight by Missouri courts. *Evans v. Empire Dist. Elec. Co.,* 346 S.W.3d 313, 318 (Mo.App. W.D.2011); *Mo. Indus. Energy Consumers,* 331 S.W.3d at 684.

The plain language of the initiating statute, section 393.1030.2(1), requires a comparison of two scenarios. The first scenario is the utility's cost of complying with the renewable energy mandate using the least-cost renewable generation. *Id.* The second scenario is the utility's cost of continuing to generate or buy electricity from entirely non-renewable resources. *Id.* The comparison is based on what costs will be in the future as evidenced by the words "estimating," "continuing," and "future" in the statute. *Id.* The comparison must take into account future environmental regulatory risks. *Id.* The statute requires averaging, but it does not direct how the two scenarios are estimated and does not specify a time period over which the averaging must occur. *Id.* The retail rate impact is then a measure of the comparison between the two scenarios set out in the statute. *Id.*

As mandated by section 393.1030.2(1), 4 CSR 240–20.100(5)(B) requires a comparison of least-cost renewable generation to non-renewable generation. The PSC chose to use a cumulative approach to

define the two revenue requirements and a ten-year averaging period as recommended by the Office of Public Counsel. Contrary to MEDA's assertion, use of the term "incremental" in subsections (5)(A) and (5)(B) does not indicate an incremental analysis but rather that the retail rate impact calculation must be performed when the utility adds the next "increment" of renewable energy. In the rule, the first revenue requirement adds to the utility's existing portfolio an additional increment of non-renewable resources sufficient to meet the utility's needs for the next ten years. 4 CSR 240–20.100(5)(B). The other, the RES-compliant portfolio, adds to the existing portfolio an amount of renewable resources sufficient to satisfy the RES plus least-cost non-renewable resources as needed to meet the utility's needs for the next ten years. *Id.* Compliance costs associated with greenhouse gas emissions are added to the additional increments of non-renewable energy resources in both revenue requirements. *Id.* Additionally, the avoided costs of fuel such as coal or natural gas not purchased for nonrenewable energy resources due to the addition of renewable energy resources is subtracted from the RES-compliant portfolio. *Id.*

Once the revenue requirements for the two portfolios are estimated, the non-renewable revenue requirement is subtracted from the renewable revenue requirement. 4 CSR 240–20.100(5)(B). The RES-compliant revenue requirement may not exceed the non-renewable revenue requirement by more than one percent. 4 CSR 240–20.100(5)(A). This cumulative approach estimates the retail rate impact over a ten-year period for all of the renewable energy additions that occur during the ten-year period to comply with the RES.[2] If the retail rate impact exceeds the

---

**2.** MIEC argues that the approach adopted by

the PSC will take into account costs of the

one percent cap, the utility shall adjust its proportion of renewable resources downward so that the revenue requirement differential does not exceed one percent. 4 CSR 240.20–100(5)(D). In other words, the utility is excused from meeting the renewable energy target.

■ Four CSR 240.20–100(5) is consistent with the intent of section 393.1030.2(1), which is to limit the retail rate impact of the RES so that rates at any time would not exceed one percent of what they would otherwise be if there were no renewable resources included in a utility's generation portfolio. The PSC explained that because the comparison of the two scenarios in section 393.1030.2(1) is between the costs of an RES-compliant generation portfolio and the costs of a hypothetical generation portfolio with no renewable resources at all, the rule's retail rate impact is not necessarily a reflection of the actual rate impact on individual retail customers. An actual rate impact on individual retail customers would, instead, be determined by comparing the costs of a utility's RES-compliant generation portfolio to the costs of its previous generation portfolio, which the statute does not require. The retail rate impact provision of section 393.1030.2(1) is a forward-looking planning analysis not designed to determine the actual retail rate impact on customers.[3] The PSC's interpretation of the statute is reasonable.

Likewise, the PSC's ten-year averaging period in the rule is reasonable. The PSC received numerous suggestions about which averaging approach to utilize from a simple one percent of the last revenue requirement approved in a rate case to a twenty-year averaging period to averaging an increase over all the rate classes. It heard evidence that purchase power agree-

---

required renewable energy only in the first year in which those costs are incurred, even though the costs themselves continue to be incurred in succeeding years. Four CSR 240.20–100(5), however, requires that the RES-compliant portfolio consider the total costs, over a ten-year period, of the generation and purchased power resources necessary to comply with the RES, as compared to a portfolio in which non-renewable resources are added to meet demands over the succeeding ten years. The PSC noted that the Office of Public Counsel's approach "would include *all* the RES compliance costs that customers are paying at a particular point in time." (emphasis added).

**3.** Section 393.1045, RSMo Cum.Supp.2011, which the General Assembly enacted in 2008 not long before approval of Proposition C and likely mindful of Proposition C, also limits the retail rate impact of a renewable energy mandate:

Any renewable energy mandate required by law shall not raise the retail rates charged to customers of electric suppliers by an average of more than one percent per year, and all the costs associated with any such renewable mandate shall be recoverable in the retail rates charged by the electric supplier. Solar rebates shall be included in the one percent rate cap provided for in this section.

Related statutes are harmonized and construed together if possible, but if they are inconsistent, a statute is impliedly repealed by a later one that revises the subject matter of the first. *Evans*, 346 S.W.3d at 318. The PSC asserts, and MIEC, Ameren, and Empire agree, that section 393.1030.2(1) and section 393.1045 can be harmonized. Because the PSC has been given the statutory authority to interpret statutes pursuant to the administration of its charge, it has the power to make such determination, and its interpretation is afforded great weight. *Evans*, 346 S.W.3d at 318–19. Section 393.1030.2(1) prohibits rates from being an average of more than one percent higher than they would have been without the RES at any time. Section 393.1045 provides that a renewable energy mandate may not increase rates by more than an average of one percent per year. Both require averaging but neither specifies the time period over which the averaging occurs. The PSC's interpretation is a reasonable exercise of its discretion.

ments for the delivery of renewable energy and planning horizons for utilities tend to be up to twenty years. The PSC properly recognized that because section 393.1030.2(1) requires an "average," it must put some meaning to the term. It reasoned that a ten-year averaging period would smooth out some of the spikes in compliance costs that might occur when new technologies are first implemented. Such explanation is reasonable in light of the 2011 to 2021 timetable in section 393.1030.1 for increasing the levels of renewable energy and the suggestions and evidence presented to the PSC.

Furthermore, 4 CSR 240–20.100(5) requires that fuel and environmental compliance costs, which are avoided by using renewable energy resources, are duly considered. The PSC properly recognized that section 393.1030.2(1) requires the retail rate impact calculation "tak[e] into proper account future environmental regulatory risk including the risk of greenhouse gas regulation" and that it must set out that process in its rule. Evidence was presented that in utilizing renewable energy resources, a utility will avoid certain costs that are otherwise incurred in utilizing non-renewable energy resources. These costs include fuel for the operation of natural gas and coal facilities and environmental compliance costs, such as emissions allowances and emissions control equipment. Consistent with section 393.1030.2(1), 4 CSR 240–20.100(5)(B) requires that these costs be accounted for in estimating the revenue requirements for the non-renewable and the renewable energy portfolios, and any attempt to double count such costs in the calculation of the retail rate impact would be unreasonable

and inconsistent with the statute and the rule.[4]

Finally, 4 CSR 240–20.100(5)(D) provides for recovery of prudently incurred costs to comply with the RES as required by section 393.1030.2(4). Such costs may be recovered through a Renewable Energy Standard Rate Adjustment Mechanism (RESRAM) procedure in accordance with subsection (6) of the rule or in a general rate case. 4 CSR 240–20.100(5)(D) and (6)(D). The RESRAM establishes one review process if the actual increase in utility revenue requirements is less than two percent and another review process if the actual increase in utility revenue requirements is equal to or more than two percent. 4 CSR 240–20.100(6)(A), (B), and (C). In the latter instance, the rule requires the PSC to hold an evidentiary hearing to determine if the proposed RESRAM is in accordance with the statute and rule. 4 CSR 240–20.100(6)(C). The PSC acknowledged that some details with regard to recovery of RES compliance costs may need to be worked out in the first RES filing for each utility. Such acknowledgment is consistent with the long-standing principle in rulemaking that each rate case must be determined on its own facts. *See State ex rel. Mo. Water Co. v. Public Serv. Comm'n,* 308 S.W.2d 704, 718 (Mo. 1957). The retail rate impact and cost recovery provisions of the rule are consistent with section 393.1030.

The revised final order of rulemaking is a reasonable exercise of the rulemaking authority granted to the PSC by section 393.1030 and its broad discretion in interpreting the statute. The points are denied.

4. Many of the concerns expressed by MIEC, MEDA, Ameren, and Empire about 4 CSR 240–20.100 revolve around how the rule might be interpreted and applied by the PSC in future proceedings and not around claims of facial invalidity. Notwithstanding the uncertainty about which these parties complain, such concerns must be addressed in future judicial review proceedings when and if the rule is applied as the parties argue it could be.

## Provisions Regarding Geographic Sourcing of RECs

MIEC, MEDA, Ameren, and Empire next contend that sections (2)(A) and (2)(B)2 of 4 CSR 240–20.100, the geographic sourcing provisions, are unlawful, unreasonable, and arbitrary and capricious. They claim that the provisions restrict the eligibility of RECs that may be counted toward an electric utility's compliance with the requirements of the RES to a facility that is either located in Missouri or, if located outside of Missouri, only if the power generated at the facility is sold to retail customers in Missouri. They argue that the provisions frustrate the purpose of the RES to allow for an unrestricted, secondary market for the purchase and sale of RECs and violate the dormant Commerce Clause of the United States Constitution.

The two paragraphs about which MIEC, MEDA, Ameren, and Empire complain are:

(2)(A) Electric Energy or RECs associated with electric energy are eligible to be counted toward the RES requirements only if the generation facility for the renewable energy resource is either located in Missouri or, if located outside of Missouri, the renewable energy resource is sold to Missouri electric energy retail customers. For renewable energy resources generated at facilities located outside Missouri, an electric utility shall provide proof that the electric energy was sold to Missouri customers.

\*     \*     \*     \*     \*     \*

(2)(B) The amount of renewable energy resources or RECs associated with renewable energy resources that can be counted towards meeting the RES requirements are as follows:

\*     \*     \*     \*     \*     \*

2. If the facility generating the renewable energy resources is located outside Missouri, the allowed amount is the amount of negawatt-hours generated by the applicable generating facility that is sold to Missouri customers. For purposes of subsections (A) and (B) of this section, Missouri electric energy retail customers shall include retail customers of regulated Missouri utilities as well as customers of Missouri municipal utilities and Missouri rural electric cooperatives.

The issue concerning geographic sourcing is, however, moot. A threshold question in appellate review of a controversy is the mootness of the controversy. *State ex rel. Public Counsel v. Public Serv. Comm'n*, 328 S.W.3d 347, 352 (Mo.App. W.D.2010).

A case becomes moot when the matter presented for review seeks a decision "upon some matter which, if the judgment was rendered, would not have any practical effect upon any then existing controversy" or "when circumstances change so as to alter the position of the parties or subject matter so that the controversy ceases and a decision can grant no relief."

*Id.* (quoting *Precision Invs., L.L.C v. Cornerstone Propane, L.P.*, 220 S.W.3d 301, 304 (Mo. banc 2007)). "A question is justiciable only where the judgment will declare a fixed right and accomplish a useful purpose." *McNeil–Terry v. Roling*, 142 S.W.3d 828, 832 (Mo.App. E.D.2004). In determining if a controversy is moot, an appellate court may consider facts outside the record on appeal. *Public Counsel*, 328 S.W.3d at 352. It is well-settled that Missouri courts do not determine moot cases or render advisory opinions. *Id.; Friends of the San Luis, Inc. v. Archdiocese of St. Louis*, 312 S.W.3d 476, 483 (Mo.App. E.D. 2010). "Appellate courts do not sit as moot courts determining speculative issues

for the benefit of some other case at some other time." *Friends of the San Luis,* 312 S.W.3d at 483 (internal quotes and citation omitted). They do not decide questions of law disconnected from the granting of actual relief. *Id.* An issue that is moot is not subject to consideration. *State ex rel. Mo. Cable Television Assoc. v. Public Serv. Comm'n,* 917 S.W.2d 650, 652 (Mo.App. W.D.1996).

▮ Two narrow exceptions to the mootness doctrine are, however, recognized. *Id.* First, the issue may be considered if the case becomes moot after it has been argued and submitted. *Friends of the San Luis,* 312 S.W.3d at 483. Additionally, the issue may be considered if it is one of general public interest and importance, recurring in nature and will otherwise evade appellate review unless the court exercises its discretionary jurisdiction. *Id.; Mo. Cable Television Assoc.,* 917 S.W.2d at 652.

Section 536.021, RSMo Cum.Supp.2011, "provides a comprehensive scheme for all rulemaking authority granted to the executive department." *Mo. Coalition for Environment v. Joint Comm. on Administrative Rules,* 948 S.W.2d 125, 135 (Mo. banc 1997). Subsection 5 of the statute provides, in pertinent part:

> Within ninety days after the expiration of the time for filing statements in support of or in opposition to the proposed rulemaking, or within ninety days after the hearing on such proposed rulemaking if a hearing is held thereon, the state agency proposing the rule shall file with the secretary of state a final order of rulemaking either adopting the proposed rule, with or without further changes, or withdrawing the proposed rule, which order of rulemaking shall be published in the Missouri Register. Such ninety days shall be tolled for the time period

any rule is held under abeyance pursuant to an executive order.

§ 536.021.5.

Within ninety days after the hearing on the proposed rulemaking, as computed pursuant to Rule 44.01(a), the PSC filed with the Secretary of State its revised order of rulemaking but stated by letter that it was not filing the paragraphs disapproved by the JCAR for publication. Instead, it requested that the paragraphs be reserved and held in abeyance. The order of rulemaking was published in the Missouri Register and in the Code of State Regulations with the paragraphs (2)(A) and (2)(B)2 reading *"Reserved"* 35 Mo. Reg. 1183 (No. 16, August 16, 2010). The PSC subsequently filed an order with the Secretary of State withdrawing the geographic sourcing provisions from 4 CSR 240–20.100 and again requesting that the provisions not be published or become effective. 36 Mo. Reg. 1003 (No. 7, April 1, 2011). In that order, the PSC stated it had not presented the provisions to the Secretary of State for publication and will not do so in the future. *Id.*

▮ The PSC's withdrawal of the provisions, the propriety of which is not contested in this case, rendered moot the points challenging them. The withdrawn provisions have not been published and thus are not effective. § 536.021.8. They are not part of 4 CSR 240–20.100 and not enforceable against electric utilities. Never having been made effective, no controversy exists regarding the proposed provisions. MIEC, MEDA, Ameren, and Empire seek an advisory opinion on the merits of geographic sourcing, but this court will not decide non-existent issues. Should the PSC decide in the future to promulgate geographic sourcing rules, it will, of course, be required to do so pursuant to the rulemaking procedures of section 536.021. Its order of rulemaking

would then be subject to judicial review under section 386.510, RSMo Cum.Supp. 2011. The points are dismissed.

The judgment of the circuit court is reversed, and the PSC's revised final order of rulemaking is affirmed.

All concur.